# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### ST. PAUL DIVISION

**FAITH ELSHARKAWY,** as herself, in her individual capacity, and as Trustee for the Next-of-Kin of **JACOB MONROE LETOURNEAU-ELSHARKAWY,** Decedent;

       Plaintiffs,

       v.

**CHISAGO LAKES SCHOOL DISTRICT BOARD OF EDUCATION;** a municipality;

**INDEPENDENT SCHOOL DISTRICT NO. 2144, CHISAGO LAKES AREA SCHOOLS, D/B/A CHISAGO LAKES SCHOOLS;** a municipality;

**DAVE ERTL,** Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in his individual capacity, only;

**JASON THOMPSON,** Associate Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in his individual capacity, only;

**CARRIE HOFFMAN,** Associate Principal, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only;

**JERILYN MATTSON,** Special Services Case Manager, Chisago Lakes High School, Independent School District No. 2144, Chisago Lakes Area Schools, in her individual capacity, only;

**Case No.**
**Hon.**

**COMPLAINT FOR DAMAGES AND JURY DEMAND**

1

**ANGELA CHRISTENSON,** School
Psychologist, Chisago Lakes High School,
Independent School District No. 2144,
Chisago Lakes Area Schools, in her
individual capacity, only;

**SHIRA BEN-HEIM,** Special Education
Teacher, Chisago Lakes High School,
Independent School District No. 2144,
Chisago Lakes Area Schools, in her
individual capacity, only;

**LEAH TAYLOR,** Special Education
Teacher, Chisago Lakes High School,
Independent School District No. 2144,
Chisago Lakes Area Schools, in her
individual capacity, only;

**CARTER VOGT,** Guidance Counselor,
Chisago Lakes High School, Independent
School District No. 2144, Chisago Lakes
Area Schools, in his individual capacity,
only;

**LAURA GUSTAFSON,** School District
Nurse, Chisago Lakes High School,
Independent School District No. 2144,
Chisago Lakes Area Schools, in her
individual capacity, only; and,

**JANE/JOHN DOES,** in their individual
capacities, only;

       Defendants, jointly and severally.

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff **FAITH ELSHARKAWY**, on behalf of herself, in her individual capacity,

and as the duly appointed Trustee for the Next-of-Kin of **JACOB MONROE**

**LETOURNEAU-ELSHARKAWY**, by and through their attorneys, **CAIR LEGAL**

**DEFENSE FUND, INC. ("CAIR")**, files this Complaint for Damages and Jury Demand

against Defendants for violations of the First and Fourteenth Amendments to the United States Constitution; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.; Title V of the Rehabilitation Act of 1973; 29 U.S.C. § 791, et seq.; 42 U.S.C. § 1983; Minnesota Wrongful Death Statute, Minn. Stat. § 573.02; the Minnesota Human Rights Act; Minn. Stat. § 604.01; and federal and Minnesota common law.  In support of their Complaint, Plaintiffs state as follows:

### Introduction

1.      On April 29, 2018, Faith Elsharkawy found her first born child, Jacob Letourneau-Elsharkawy, hanging lifeless in a shed behind their home.  He was young, just a freshman in high school.

2.      Jacob's death by suicide was not some inevitable tragedy. This child's death had a cause.

3.      Inside classrooms and on the bus, in the hallways and at lunch time—Jacob was choked, tripped, stabbed, and beaten. Kids threw food at him and broke his glasses.  They mocked his faith, calling him a "gay terrorist" and "bomber man."  Kids made fun of his mother because she wore hijab.

4.      There were two violent attacks many months apart that ended with Jacob in the hospital—concussed, riddled with bruises, and overwhelmed by an ever-deepening despair.

5.      The Chisago Lakes School District did more than simply fail Jacob, though its administrators and teachings did fail him.  Officials saw the bullying and jumped in themselves.  They sanctioned it and, on occasion, it was an administrator or teacher leading the way.

6.     "Don't fucking text your mother or I'm going to take [your phone] and break it."  That is what an assistant principal said to Jacob as the tormented student sought Faith's help in dealing with the latest humiliating and degrading incident.  It was a message—delivered by an administrator with a responsibility to know and do better—emblematic of Chisago Lake School District's callous approach to Jacob.  Officials treated complaints about bullying as a nuisance to be minimized rather than the life and death issue they let it to become.

7.     Jacob's death did not just happen.

## Parties

8.     Jacob Monroe Letourneau-Elsharkawy ("Jacob"), the decedent, was a minor and resident of Minnesota at all relevant times, including at the time of his death on April 29, 2018.  At the time of his death, Jacob was a student at Chisago Lakes High School located at 29400 Olinda Trail, Lindstrom, MN 55045.  Jacob was a student, at all relevant times, and attended school under an Individual Education Plan ("IEP") as defined by 34 CFR § 104.33(b)(1).

9.     Plaintiff Faith Ann Elsharkawy (hereinafter "Mrs. Elsharkawy") is the duly appointed Trustee for the Next-of-Kin of Jacob Letourneau-Elsharkawy.  Mrs. Elsharkawy is Jacob Letourneau's mother and sole heir. Mrs. Elsharkawy was also a member of Jacob's IEP team. She is, and was at all relevant times, a resident of Minnesota. Mrs. Elsharkawy brings this action both as herself pursuant to 20 U.S.C. § 1400(i)(3)(B) and as the duly appointed Trustee for the Next-of-Kin of Jacob Letourneau-Elsharkawy pursuant to Minn. Stat. § 573.02.

10.    Defendant Chisago Lakes School District Board of Education (hereinafter "Chisago Lakes School Board") is the governing body of Defendant Chisago Lakes Schools. Vested by statutory and constitutional authority, Defendant Chisago Lakes School Board has the responsibility for the care, management, and control over public schools in the school district, including Defendant Chisago Lakes Schools. Defendant Chisago Lakes School Board has the general charge over the business of Defendant Chisago Lakes Schools as well as its facilities and property. Defendant Chisago Lakes School Board has both specific authority granted by the Minnesota legislature in addition to implied authority to conduct the business of Defendant Chisago Lakes District.  Its explicit duties, include, among others, to: (1) provide services to promote the health of its pupils; (2) employ and contract with necessary qualified teachers and discharge the same for cause; and, (3) provide for transportation of pupils to and from school. The members of Chisago Lakes School Board, at all relevant times, include Mark Leigh, Chair; Lori Berg, Vice Chair; Dani Strenke, Clerk; Brenda Carlson, Treasurer; Jerry Vitalis, Director; and, Melissa Donovan, Director. This Court has personal jurisdiction over Defendant Chisago Lakes School Board, because Defendant Chisago Lakes School Board is an instrument of a Minnesota municipality, because it conducts business in the State of Minnesota, and because the challenged acts and/or omissions took place in the State of Minnesota. *See* Chisago Lakes Schools Policy Nos. 201[1], 211[2]; Minn. Stat. §§ 123B.02, 123B.09, 466.07.

---

[1] Chisago Lakes Schools Policy No. 201, Legal Status of the School Board. *Available at:*
https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/200/pol201_LEGAL_STATUS_OF_THE_S
CHOOL_BOARD.pdf
[2] Chisago Lakes Schools Policy No. 211, Criminal or Civil Action Against School District, School Board Member, Employee or Student. *Available at:*
https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/200/pol211_CRIMINAL_OR_CIVIL_ACTI
ON_AGAINST_SCHOOL_DISTRICTS_etc.pdf

11.     Defendant Independent School District No. 2144, Chisago Lakes Area Schools, d/b/a Chisago Lakes Schools (hereinafter "Chisago Lakes Schools") is a public corporation and separate legal entity subject to the control of the legislature, limited only by constitutional restrictions. Defendant Chisago Lakes Schools is a public school whose purpose is to provide equal education opportunity for all students in its district, including Chisago Lakes High School and Chisago Lakes Middle School, where Jacob at all relevant times attended. Its mission is to "offer high-quality education in a dynamic, supportive learning environment and to help all learners develop the knowledge, skills and attitudes necessary to lead healthy, productive, fulfilling, and socially responsible lives in a diverse and changing world." Defendant Chisago Lakes Schools Policy prohibits discrimination on the basis of religion and disability, among other bases, and requires reasonable accommodations for disabled students. *See* Chisago Lakes Schools Policy Nos. 101[3], 102[4], 104[5].  This Court has personal jurisdiction over Defendant Chisago Lakes School Board, because Defendant Chisago Lakes Schools is an instrument of a Minnesota municipality, because it conducts business in the State of Minnesota, and because the challenged acts and/or omissions took place in the State of Minnesota.

12.     Defendant Dave Ertl (hereinafter "Defendant Ertl") is, and was at all relevant times, the Principal of Chisago Lakes High School, a subdivision of Defendant Chisago Lakes Schools. As Principal, Defendant Ertl is responsible for: (1) educational and effective

---

[3] Chisago Lakes Schools Policy No. 101, Legal Status of the School District. *Available at:* https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/100/pol101_Legal_Status_of_the_School_District.pdf

[4] Chisago Lakes Schools Policy No. 102, Equal Education Opportunity. *Available at:* https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/100/pol102_Equal_Educational_Opportunity.pdf

[5] Chisago Lakes Schools Policy No. 104, School District Mission Statement. *Available at:* https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/100/pol104_School_District_Mission_Statement.pdf

professional leadership in Chisago Lakes High School and community; (2) the well-being of all Chisago Lakes High School students; (3) supporting the principal of due process and protecting the civil and human rights of Chisago Lakes High School students, (4) implementing Chisago Lakes School Board policies. *See* Chisago Lakes Schools Policy No. 301[6], 306[7]; Minn. Stat. §§ 122A.14, Subd. 4; Minn. Rules Part 3512.5200. Defendant Ertl is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached his duties and standards of care that he owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Ertl because he resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Ertl is being sued in his individual capacity, only, for discriminatory acts and/or omissions against Jacob.

13.     Defendant Jason Thompson (hereinafter "Defendant Thompson") is, and was at all relevant times, an Associate Principal of Chisago Lakes High School. As Associate Principal of Chisago Lakes School, Defendant Thompson is responsible for assisting Defendant Ertl with the administration and implementation of all his responsibilities. Additionally, Defendant Thompson is, and was at all relevant times, the Dean of Students for 10th and 11th grade students and the Truancy Coordinator. Defendant Thompson is a

---

[6] *Id.*
[7] Chisago Lakes Schools Policy No. 306, Administrator Code of Ethics. *Available at:* https://www.isd2144.org/cms/lib/MN02205235/Centricity/domain/19/300/pol306_Administrator_Code_of_Ethics.pdf

mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached his duties and standards of care that he owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Thompson because he resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Thompson is being sued in his individual capacity, only, for discriminatory acts and/or omissions against Jacob.

14.    Defendant Carrie Hoffman (hereinafter "Defendant Hoffman") is, and was at all relevant times, an Associate Principal of Chisago Lakes High School. As Associate Principal of Chisago Lakes School, Defendant Hoffman is responsible for assisting Defendant Ertl with the administration and implementation of all his responsibilities. Additionally, Defendant Hoffman was at all relevant times an Administrative Representative and member of Jacob's IEP team during the 2017 to 2018 school year until the time of Jacob's death. Accordingly, she was intimately familiar with Jacob's disabilities and needs, and was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the program is provided in the least restrictive environment possible. Defendant Hoffman is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached her duties and standards of care that she owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school

environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Hoffman because she resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Hoffman is being sued in her individual capacity, only, for discriminatory acts and/or omissions against Jacob.

15.     Defendant Jerilyn Mattson (hereinafter "Defendant Mattson") is, and was at all relevant times, a Special Services Case Manager at Chisago Lakes High School. Defendant Mattson was the Special Services Case Manager assigned to Jacob at Chisago Lakes High School and a member of Jacob's IEP team from at least March 2017 until the time of Jacob's death. Accordingly, she was intimately familiar with Jacob's disabilities and needs, and she was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the program is provided in the least restrictive environment possible. Defendant Mattson is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached her duties and standards of care that she owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious, and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Mattson because she resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Mattson is being sued in her individual capacity, only, for discriminatory acts and/or omissions against Jacob.

16.     Defendant Angela Christensen (hereinafter "Defendant Christensen") is, and was at all relevant times, a School Psychologist at Chisago Lakes High School. Defendant Christensen was the School Psychologist assigned to Jacob and a member of Jacob's IEP team while he was a student at Chisago Lakes Middle School during at least the summer of 2017 when Jacob was transitioning to Chisago Lakes High School. Accordingly, she was intimately familiar with Jacob's disabilities and needs, and was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the program is provided in the least restrictive environment possible. Defendant Christensen is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached her duties and standards of care that she owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious, and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Christensen because she resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Christensen is being sued in her individual capacity, only, for discriminatory acts and/or omissions against Jacob.

17.     Defendant Shira Ben-Heim (hereinafter "Ben-Heim") is, and was at all relevant times, a Special Education Teacher at Chisago Lakes High School. Defendant Ben-Heim was the Special Education Teacher assigned to Jacob and a member of Jacob's IEP team. Accordingly, she was intimately familiar with Jacob's disabilities and needs, and was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the

program is provided in the least restrictive environment possible. Defendant Ben-Heim is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached her duties and standards of care that she owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious, and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Ben-Heim because she resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Ben-Heim is being sued in her individual capacity, only, for discriminatory acts and/or omissions against Jacob.

18.     Defendant Carter Vogt (hereinafter "Defendant Vogt") is, and was at all relevant times, a Guidance Counselor at Chisago Lakes High School. Defendant Vogt was the Guidance Counselor assigned to Jacob and a member of Jacob's IEP team during the 2017-2018 school year until the time of Jacob's death. Accordingly, he was intimately familiar with Jacob's disabilities and needs, and was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the program is provided in the least restrictive environment possible. Defendant Vogt is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached his duties and standards of care that he owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate,

serious and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Vogt because he resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota. Defendant Vogt is being sued in his individual capacity, only, for discriminatory acts and/or omissions against Jacob.

19.     Defendant Laura Gustafson (hereinafter "Defendant Gustafson") is, and was at all relevant times, a School District Nurse at Chisago Lakes High School. Defendant Gustafson was the School District Nurse assigned to Jacob and a member assigned to Jacob at Chisago Lakes Middle School and a member of Jacob's IEP team while he was a student at Chisago Lakes Middle School during at least the summer of 2017 when Jacob was transitioning to Chisago Lakes High School. Accordingly, she was intimately familiar with Jacob's disabilities and needs, and was responsible for designing an IEP that uniquely addressed Jacob's needs and to ensure the program is provided in the least restrictive environment possible. Defendant Gustafson is a mandated reporter pursuant to Minn. Stat. § 626.556 who witnessed the violence, harassment and bullying of Jacob, and who breached her duties and standards of care that she owed Jacob by failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety. This Court has personal jurisdiction over Defendant Gustafson because she resides and conducts business in the State of Minnesota, and because the challenged conduct took place in the State of Minnesota.   Defendant Gustafson is being sued in her individual capacity, only, for discriminatory acts and/or omissions against Jacob.

20.     Defendants Jane and John Does (hereinafter "Defendants Jane and John Does") are Chisago Lakes Schools employees that are mandated reporters pursuant to Minn. Stat. § 626.556 and that witnessed the violence, harassment and bullying of Jacob. Defendants Jane and John Does breached their duties and standards of care they owed Jacob failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety.  This Court has personal jurisdiction over Defendants Jane and John Does because upon information and belief, they reside, and because they conduct business in the State of Minnesota, and because the challenged acts and/or omissions took place in the State of Minnesota.  Defendants Jane and John Does are being sued in their individual capacities, only, for discriminatory acts and/or omissions against Jacob.

## Jurisdiction and Venue

21.     This Court has original federal question jurisdiction over Plaintiffs' claims of violations of the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendments of the United States Constitution; Title V of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.; Title V of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq.; 29 U.S.C. § 794; 42 U.S.C. § 1983; 42 U.S.C. § 1988; 28 U.S.C. § 1341; 28 U.S.C. § 1343; and, federal common law.

22.     This Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1400(i)(2)(A).

23.     This Court has supplemental jurisdiction over Plaintiffs' state law claims, including, but not limited to, Plaintiffs' claims of violations of Minn. Stat. § 363A.11, Minn. Stat. § 604.01, Minn. Stat. § 573.02, and Minnesota common law, pursuant to 28 U.S.C. § 1367.

24.     This Court has personal jurisdiction over Defendants because Defendants reside and conduct business in the State of Minnesota.

25.     Plaintiffs are entitled to attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B), 29 U.S.C. § 794a, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

26.     Plaintiffs are entitled to compensatory damages, punitive damages, and expert witness fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 42 U.S.C. § 1981a(b).

27.     Plaintiffs are entitled to punitive damages pursuant to Minn. Stat. § 466.04.

28.     This Court has personal jurisdiction over Defendants because Defendants reside or are municipal corporations of Minnesota and because the conduct at issue in this litigation took place in Minnesota.

29.     Venue is proper pursuant to 28 U.S.C. § 1391 as to Defendants because all Defendants reside in and conduct business in the State of Minnesota and because Defendants' acts and/or omissions took place in Minnesota.

**Factual Background**

30.     Jacob was born and raised in Minnesota, to a family that loved him deeply and now misses him tremendously.

31.     Jacob converted to Islam on October 4, 2009, and in 2010, Jacob moved to Egypt to live with his stepfather.  During his time in Egypt, Jacob embraced his faith fully, and it became a core aspect of his identity.

14

32.     Jacob was proud to be Muslim.  He spoke to friends and students about Islam. He also wore *tasbeeh*—beads Muslims sometimes use to help count repetitive prayers—on his wrist to school and spoke openly and confidently about his religious practices.  The day before Jacob's death, he wrote "[I] fasted.  [R]eligion is my rhythm."

33.     A few months before his death, during an IEP meeting at school, Jacob was asked about his plans for the future.  After high school, he wanted to work part-time and attend a four-year college so that he could pursue a career in a field he loved and for which he had a knack: graphic design.  He had dreams of getting married young and moving into a home in the city.

**Defendants knew that their students relentlessly—and sometimes violently—bullied Jacob and allowed the bullying to persist**

34.     For the entire duration of Jacob's enrollment at Defendant Chisago County School District's schools, students bullied Jacob.  This bullying was pervasive and constant, manifesting in too many discrete incidents to list.  This pattern of bullying was punctuated by episodes of serious violence, including two incidents that resulted in a concussion.

35.     Jacob's encounters with student bullying were promptly and repeatedly brought to Defendant Chisago County School District's attention by both Mrs. Elsharkawy and Jacob.  Before Jacob was a Chisago Lakes Schools student for even 20 days, his mother reported rampant bullying to Defendants.  School personnel acknowledged this initial report and stated that they would both investigate the bullying and check in with Jacob in an effort to end the bullying.  Neither occurred.

36.     Students bullied Jacob about his faith and about his disabilities on a near-daily basis—in hallways and in the classroom as well as in the lunchroom, in the gym, and on the bus.

37.     Rather than intervene, Defendants would often punish Jacob when either he or his mother would report bullying to school staff.

38.     In March 2018, the month prior to Jacob's death, Defendant Thompson threatened Jacob when he attempted to alert his mother to a bullying incident that led to school personnel punishing Jacob, telling him "Don't fucking text your mother or I'm going to take [your phone] and break it."

39.     Students taunted Jacob for being Muslim by repeatedly calling him a terrorist, bomber man, and a gay terrorist, and asking him if he was going to marry four wives, among other slurs based on Jacob's faith.  They also mocked him because his mother wore a hijab (a religious head covering worn by Muslim women) and because his father was an Arab Muslim man.

40.     Students also taunted Jacob about his disabilities, calling him, among other things a "retard."

41.     In school, students directed such slurs at Jacob with such regularity that the bullying was a defining feature of the education Defendant Chisago Lakes Schools provided Jacob.

42.     This environment of intimidation—which Defendants knew existed and allowed to persist—is what gave permission to Jacob's tormentors to regularly escalate their bullying to severe physical violence that in at least two instances landed him in the hospital with a concussion.

43.     In September 2016, within a classroom that became a hot spot for rampant bullying, a student stabbed Jacob with a pencil with such force that the pencil lead was lodged in his skin.  This incident was reported to Defendant Chisago Lakes Schools.

44.     In October 2016, on Defendant Chisago Lakes Schools' bus, students tied Jacob's shoelaces to a fixture with the aim of having him fall when he attempted to get up from his seat. This incident was also reported to Defendant Chisago Lakes Schools.

45.     In October 2016, a student threw Jacob into a metal door frame, causing him to lose consciousness.  After seeking medical care, Jacob was diagnosed with a concussion and shoulder injury as a result of this bullying episode.  This incident was also reported to Defendant Chisago Lakes Schools.

46.     In February 2017, while Jacob was walking in the hallway, students hoisted Jacob in the air against his will.  This incident was also reported to Defendant Chisago Lakes Schools.

47.     In March 2017, after mocking Jacob for wearing glasses, a student took Jacob's glasses and broke them.  This incident was also reported to Defendant Chisago Lakes Schools.

48.     In May 2017, a student stole Jacob's sandwich and slammed it in on the table in front of Jacob in a manner intended to intimidate Jacob.  This incident was also reported to Defendant Chisago Lakes Schools.

49.     In October 2017, on Defendant Chisago Lakes Schools' bus, a student placed both of his hands around Jacob's neck and choked him.  This incident was also reported to Defendant Chisago Lakes Schools.

50.     In November 2017, a student crowded Jacob's personal space, put his fist close to Jacob, and threatened to "fucking knock [Jacob's] teeth out."   This incident was also reported to Defendant Chisago Lakes Schools.

51.     In November 2017, on Defendant Chisago Lakes Schools' bus, a student pummeled Jacob—punching him repeatedly in the face, head, and chest, ripping his clothes, and pulling hair from Jacob's scalp.  As a result of this assault, and after seeking medical care, Jacob was diagnosed with a concussion and the attack left him with extensive bruising on his face and much of his upper body. This incident was also reported to Defendant Chisago Lakes Schools.

52.     In February 2018, a group of students threw spaghetti at Jacob during lunch. This incident was also reported to Defendant Chisago Lakes Schools.

53.     In March 2018, a student tripped Jacob in a manner that caused him to fall with enough force to knock over a large and very full garbage can.  This incident was also reported to Defendant Chisago Lakes Schools.

54.     Jacob's mother also her concerns about student bullying repeatedly to school personnel at IEP meetings – meetings that Jacob was required to attend – in an effort to address the issue systematically, including on the following dates: May 19, 2017, June 6, 2017, August 31, 2017, January 12, 2018, February 12, 2018.

55.     However, Defendants refused to take any action to investigate the bullying or to take any preventative measures whatsoever.

56.     These violent incidents are illustrative and not exhaustive. They were not inflicted by one student or by a discrete group of students. These violent bullying episodes are indicative of Defendants' complete failure to provide a safe school environment for Jacob and

that Defendants created an environment where bullying Jacob had become an accepted norm–a norm that would inevitably present a serious danger to Jacob's safety and well-being–because Defendants did not care to stop it.

### Jacob was diagnosed as a child with disabilities that required Chisago Lakes School District to provide him with accommodations.

57.     Jacob's social and academic challenges were known to all schools he attended as well as the school personnel that served him, including all Defendants.  By the time he became a Chisago Lakes Schools student in September 2016, the accommodations Jacob needed, and that Chisago Lakes Schools was legally obligated to provide, were voluminously documented, and Defendants willfully and repeatedly violated the IEP they created and were required by federal and state laws to implement.

58.     Jacob was given an initial special education evaluation for services in Grand Rapids, Minnesota, in January 2007 when he was four years old.  As a result of this evaluation, Jacob qualified for Early Childhood Special Education Services under the criteria for Emotional/Behavior Disorder and Developmental Delay and has received special education services since.

59.     Jacob attended kindergarten at Grand Rapids School District where he received special education services in accordance with an IEP which included daily social skill teaching outside of the classroom as well as academic support within the classroom setting.

60.     In May 2009, Jacob received reading support and special education services focused on giving him the tools he needed to improve his social skills.

61.     In 2011, Jacob enrolled at St. Paul Music Academy for third grade. Academic support was added to his IEP.

62.     In August 2012, based on a review of Jacob's evaluation from St. Paul Public Schools and Dr. Plasch's diagnoses, Jacob was recommended for special education services as he transitioned to St. Anthony Middle School.

63.     At age 9, Steve Plasch, Psy.D. Licensed Clinical Psychologist, assessed Jacob. Dr. Plasch diagnosed Jacob with Attention Deficit/Hyperactivity Disorder, Learning Disorder with difficulties in all academic areas measured, anxiety disorder and moderate to severe difficulties with school and home life.

64.     Dr. Plasch also defined areas where Jacob needed extra assistance and appropriate accommodations in the academic setting to compensate for areas of cognitive and social weaknesses.

65.     On October 30, 2012, when Jacob was 10 years old, specialists conducted a Speech, Language, and Pathology Evaluation and concluded Jacob presented delayed skills in receptive and expressive language, auditory memory and language processing, and difficulty retaining information.  The evaluation recommended Jacob be given, among other things, extra time to respond to academic instruction, preferential seating, and supports to help him improve language skills. It also recommended that Jacob receive speech and language therapy.  This evaluation adopted the recommendations that accompanied Dr. Plasch's neuropsychological diagnoses to assist Jacob with academic and behavioral success while in school.

66.     Jacob was reevaluated by St. Paul Music Academy on January 18, 2013, specifically regarding the categories of Emotional/Behavioral Disorder and Other Health Disability. The evaluation report prepared by St. Paul Music Academy concluded that Jacob's diagnosis of ADHD and his difficulty with sensory processing impacted his performance in

the educational setting due to heightened or diminished alertness, impaired ability to manage and organize materials and inability to complete tasks within a timely manner. Moreover, "Jacob's difficulty with anxiety and handling frustration in academic and social situations affect[s] his ability to independently complete tasks to the level of which he is capable and maintain social relationships in the general education setting. Jacob will have difficulty progressing in the general education setting without specialized instruction and individual accommodations."

67.     As a result of this reevaluation, the school determined that it must provide Jacob with additional supports. The IEP based on Jacob's reevaluation then required the school to provide Jacob with special supports in the areas of work completion skills, organization skills, his on-task behavior, and dealing with academic and social frustrations.

68.     The 2013 IEP produced by St. Paul Music Academy also required that a teacher or speech therapist deliver special education services primarily within the regular class and outside of the regular classroom for less than 21 percent of the school day.

69.     By the time Jacob started middle school in 2015, Jacob was diagnosed with ADHD, anxiety, asthma, adjustment disorder, and sensory processing/overload disorder. ADHD-hyperactive type symptoms such as fidgeting, running, and climbing. He also had difficulty coping with excessive fatigue and muscle tension, resulting in irregular sleep patterns and panic attacks.

70.     On September 15, 2015, upon his transition to Chisago Lakes Middle School, Defendant Chisago Lakes Schools revised Jacob's IEP. Jacob's revised IEP required a teacher or therapist to deliver special education services primarily within a resource setting, outside of the classroom, between 21-60% of the day.

71.     Among the measurable goals and targeted skills his IEP listed was increasing Jacob's self-advocacy skills (Goal No. 2).  This goal reflected the bullying that Jacob was experiencing and Chisago Lakes School's plan that Jacob would hone his "self-advocacy skills" in order to ward off the pervasive predations of other students.

72.     While Jacob was a student at Chisago Lakes School Middle School, Defendant Chisago Lakes Schools modified Jacob's IEP to include the following accommodations:

a.      Due to Jacob's Sensory Processing Disorder and ADHD, Jacob would be seated at the back of the room to minimize attention drawn to him as he engages in behaviors to meet his sensory needs.

b.      Due to Jacob's Sensory Processing Disorder and ADHD, Jacob would be permitted to put his hood up and his head down for brief period of time during moments of over-stimulation and sensory overload.

c.      Due to Jacob's health needs, he would be permitted to access the bathroom whenever needed.

d.      Jacob would have paraprofessional support in science, social studies, and allied arts to assist with behavioral redirection and to provide academic support.

e.      Due to Jacob's Sensory Processing Disorder, Jacob would be permitted to take brief breaks in the hallway when he required increased or decreased sensory input.

f.      Jacob's several health conditions were expected to impact his attendance and ability to complete academic tasks.

73.     Jacob's IEP described one of the effects of his disability in the general education setting:  "Jacob's Other Health Disability affects his ability to independently self-advocate …

22

in the general education setting, Jacob needs a special education paraprofessional to provide him with behavioral redirections, model and reinforce self-advocacy skills …"

74.     As of December 2015, Jacob had also been diagnosed with speech processing delays, learning delays, adjustment disorder, depression, and hypermobility.

75.     A comprehensive IEP evaluation was conducted on December 2, 2015, whereby it was determined that Jacob continued to require specialized instruction due to his disabilities. Chisago Lakes Schools determined that his disabilities "impact[ed] his processing speed, ability to comprehend grade level material, writing ability, his ability to complete grade level math, and his ability to maintain focus and organization … also impacts his sensory needs, overall health, and attendance."

76.     Jacob's IEP was modified on December 19, 2015. His IEP included the same measurable goals and targeted skills, including increasing his self-advocacy skills (Goal No. 2). However, his IEP added to Goal No. 2 that "Jacob needs to increase his self-advocacy skills in order to achieve a greater level of success and independence in the academic setting and prepare for situation[s] [sic] that will occur outside of the academic setting." His accommodations related to these two goals remained the same.

77.     His IEP placed him in the special education setting for language, arts, and math and in the general setting for science, social studies, physical education, advisement, lunch, passing time, field trips and any other school wide activities and assemblies. His accommodations, modifications and supports were not modified.

78.     An IEP Progress Report, dated February 23, 2015, showed insufficient progress on his measurable goals and targeted skills, including increasing Jacob's self-advocacy skills (Goal No. 2).

79.     An Occupational Therapy Evaluation performed on March 7, 2016 proposed a treatment plan to address Jacob's emotional and academic needs.   The treatment plan included occupational therapy, treatment to address clinical concerns including reflex pattern integration, self-care, sensory processing and modulation, overall strength and endurance, motor coordination, visual perceptual and hand/eye fine coordination, and overall motor planning.   The treatment recommended collaboration with Chisago Lakes Schools and other community staff.

80.     On April 8, 2016, Jacob was diagnosed with postural orthostatic tachycardia syndrome ("POTS"), an autonomic nervous system dysfunction that causes fatigue. According to the diagnosis, POTS causes Jacob difficulty in keeping up with regular school and social activities, and rapid changes in position may cause dizziness and near syncope, a temporary loss of consciousness or fainting usually related to insufficient blood flow to the brain.

81.     On May 19, 2016, Jacob was reevaluated for psychological disorders. His diagnoses reaffirmed his anxiety disorder and ADHD. The diagnosis was accompanied by recommendations, many of which were already being implemented.   However, it included a recommendation to use lists, reminders, and calendars. It also recommended positive reinforcement, allowing choices and alternatives, identifying places for Jacob to regain composure during times of frustration and anxiety, and breaking tasks into manageable steps. In the school setting, it was recommended to be seated away from distractions, providing nonverbal support to help maintain attention and remember instructions and removing distractions.

**Upon transitioning to high school, Defendants were aware of Jacob's vulnerabilities in his ability to advocate for himself, as well as his depression and anxiety.**

82.     In anticipation of Jacob's transition to high school, a Behavior Assessment System for Children (BASC-3) was completed by Defendants Peterson, his Study Skills paraprofessional Nancy Carlin, Mrs. Elsharkawy and Jacob on June 2, 2016.

83.     On the Behavioral Symptoms Index ("BSI"), Jacob was rated as "At-Risk" in the areas of hyperactivity, aggression, depression, attention problems and atypicality by Mrs. Carlin and Mrs. Elsharkawy.

84.     In the area of Internalizing Problems, Jacob was rated to be Clinically Significant in connection with anxiety and depression by Mrs. Carlin and At-Risk by Mrs. Elsharkawy.

85.     Mrs. Carlin also rated Jacob to be in the Clinically Significant range in the area of Atypicality and Mrs. Elsharkawy rated him as At-Risk in the area of Withdrawal.

86.     Upon his transition to Chisago Lakes High School, Jacob's IEP continued to describe one of the effects of his disability in the general education setting as one that affects his ability to independently self-advocate.

87.     In his IEP Evaluation Report prepared in anticipation of Jacob's transition to high school, dated June 6, 2017, Jacob's IEP Case Manager, Defendant Brianna Claeson, noted that "Jacob seems to quickly correct behaviors with redirection and the possibility of earned privileges for positive choices with regards to behavior and completing tasks."

88.     On the other hand, the Evaluation Report included a Functional Behavior Assessment, conducted by Defendant Christensen, which highlighted the types of consequences that increase or do not have any impact on target behaviors for Jacob. Specifically, it was determined by the IEP team that adult redirection, removal from the

classroom, stop-and-think tickets, behavior referrals, detentions, and other utilized behavior consequences achieve the opposite result with Jacob – not only are these types of disciplinary actions ineffective with Jacob, but they result in the increase of the very same behaviors that the IEP team is seeking to correct.

89.    The IEP team also determined that Jacob is more likely to engage in arguing when he is redirected by an adult and given consequences for misbehavior.

90.    The IEP Evaluation Report provided functional alternatives that Chisago Lakes Schools staff should take to achieve targeted behaviors, which included *inter alia*, most significantly, providing Jacob with a paraprofessional escort during supervised passing time in between classes and using positive reinforcement as opposed to criticism, including coupling statements, empathy statements, praise statements, choice statements and praise and recognition for appropriate behaviors.

91.    Jacob had been disciplined in the eighth grade ten times.

92.    The IEP Evaluation Report also proposed the addition of assessments in the areas of Occupational Therapy and Speech Language.

93.    On September 14, 2016, his IEP was revised to add accommodations and modifications that addressed his May 19, 2016 diagnoses and recommendations.

94.    On December 2, 2016, having shown insufficient progress, his IEP kept his measurable goals and targeted skills largely unchanged, including increasing Jacob's self-advocacy skills (Goal No. 2). It also added that progress must be reported four times per year in writing concurrent with quarter grades.

26

95.     On October 11, 2017, another IEP Evaluation Report was prepared that included *inter alia* as health diagnoses ADHD, adjustment disorder, depression, anxiety, and autism based upon current medical records.

96.     The IEP Evaluation Report explained that Jacob's ADHD "is a neurological disorder which causes a disruption in [Jacob's] ability to self-regulate and organize [his] behavior in response to environmental stimuli which may lead to decreased social skills, increased impulsivity and poor decision choices."

97.     The IEP Evaluation Report went on to explain that ADHD impacts learning secondary to a lack of focus and attention, a lack of organizational skills and the lack of ability to remain on and to complete a task or assignment.

98.     Moreover, his anxiety, the IEP Evaluation Report explained, creates a tendency to self-isolate, excessively worry and avoid work due to frustration and perceived failure.

99.     The IEP Evaluation Report reviewed and adopted the results of the BASC-3 and Defendant Christensen's Functional Behavior Assessment in full.

100.    The IEP Evaluation Report included concerns of "bullying, effective communication, getting detentions, health, ADHD, anxiety, issues with change, fear of not being accepted." Specifically, Mrs. Elsharkawy reported that Jacob has been teased for being Muslim and that he has had a difficult time navigating conflict.

101.    Defendant Jerilyn Mattson, who was Jacob's IEP case manager at the time, also included in the report a concern that she had regarding bullying of Jacob; his ability to advocate for himself; how his ADHD interferes with his interactions with teachers and peers; his punctuality for school; management of time and deadlines and management of daily

responsibilities; and, that Jacob thinks his disability impacts how peers recognize and accept him. Her conclusion was that Jacob has impaired ability to manage and organize materials with routine timelines, impaired ability to follow directions or initiate and complete a task, and heightened or diminished alertness resulting in impaired abilities, such as maintaining focus.

102.    The IEP Evaluation Report also noted the mental health support being provided by TSA: "Jacob is currently engaged in counseling therapy through Therapeutic Services Agency (TSA) School-Linked Mental Health supports in order to address concerns with depression, anxiety, and attention problems.  In addition, Jacob has experienced a number of negative life consequences that cumulative impact his mental health functioning."

103.    Finally, the IEP Evaluation Report adopted prior instructions to utilize a paraprofessional to escort him between classes, and to utilize consequence strategies of using coupling statements, empathy statements, praise statements, choice states and praise and recognition for appropriate behaviors. It also instructed that staff should "[t]alk to Jacob discretely one-on-one to address behavior expectations.  If there is disagreement, allow Jacob a later time to discuss the disagreement in a respectful manner" as opposed to disciplinary action. Mrs. Elsharkawy corroborated this, as noted in the report, that "punishment does not work—it makes it worse."

104.    Jacob's IEP was revised on November 17, 2017.  His measurable goals and targeted skills were modified but kept increasing Jacob's self-advocacy skills (now Goal No. 1).

105.    His Least Restrictive Environment Explanation, pursuant to C.F.R. § 300.320(a)(5), included in a part as a reason to continue to separate him from non-disabled

28

students in the regular classroom and other activities that Jacob continued to require specialized instruction due to his Other Health Disability, which impacts *inter alia* his ability to maintain focus and organization, his sensory needs, overall health and attendance.

106.    His accommodations, modifications and supports remained unchanged and were adopted in full.

107.    On December 1, 2017, his IEP was modified to include *inter alia* post-secondary and transition support.

108.    He was also determined to be eligible for Extended Year Service because "[t]here will be a significant regression of a skill or acquired knowledge from the pupil's performance on an annual goal that requires more than the length of the break in instruction to recoup," in connection with all of his IEP goals, including increasing self-advocacy skills (Goal No. 1).

**Defendants failed to protect Jacob from a torrent of harassment, bullying and violent assaults by other students combined and disciplined him against Jacob in clear violation of his IEP as retaliation, causing his suicide.**

109.    As soon as Jacob started seventh grade in September 2015, he became the target of constant and aggressive harassment and bullying by other students due to his behavioral and cognitive disabilities.

110.    Jacob's mother, family and close friends advised Jacob not to reveal his Islamic identity to other students, because they worried the bullying he faced would intensify.

111.    However, as soon as Jacob's mother began wearing hijab or religious head covering, Jacob insisted on identifying openly as a Muslim, believing that revealing his Islamic identity would give him the opportunity to teach other students about Islam and that they would accept him.

112. Unfortunately, as Jacob's mother, family and close friends anticipated, bullying by other students intensified.

113. Students began calling him "bomber man" and terrorist. They mocked and ridiculed him for being Muslim and his mother for wearing the hijab.

114. Nonetheless, when students ridiculed him for being Muslim, Jacob would respond by attempting to educate and inform them about the Islamic faith and what it was really about.

115. Mrs. Elsharkawy immediately contacted PACER Center, a nonprofit organization that advocates on behalf of children, youth and young adults with disabilities and their families.

116. On September 18, 2016, PACER advocate Susan Shimota attended a special IEP meeting with Chisago Lakes Schools and Mrs. Elsharkawy to raise and address concerns of bullying by students. His IEP team assured Mrs. Elsharkawy that steps would be taken to address the bullying; however, steps were never taken. Jacob continued to be bullied by students for the remainder of the school year.

117. In September 2016, almost immediately after Jacob began his eighth-grade school year, multiple students began bullying Jacob and stabbed him multiple times with a pencil over the course of two days. Jacob suffered from an infection as a result. Jacob was the only student disciplined in connection with these incidents.

118. Jacob's anxiety in the school setting intensified. He begged his mother not to file a complaint about the bullying incidents because he feared retaliation by school administrative staff in the form of disciplinary action.

119.    Nonetheless, Mrs. Elsharkawy contacted his IEP manager, Ms. Claeson, to address her increasing concerns regarding the apparent intensifying of bullying Jacob was suffering at the hands of other students at the school.

120.    Neither Claeson nor any other Chisago Lakes Schools staff took any steps to address concerns related to bullying of Jacob.  Nor did Chisago Lakes Schools staff implement any accommodations or modifications to Jacob's IEP plan for the purpose of placing him in a safer environment to prevent continued bullying or to separate him from the students that bullied him.

121.    Instead, Mrs. Elsharkawy's complaint prompted Chisago Lakes Schools staff to retaliate against Jacob by taking additional disciplinary action against him.  Although Jacob's IEP required appropriate nonpunitive responses when Jacob was not able to sit still, tapped his pencil, fidgeted in his seat, or temporarily lost his attention, Chisago Lakes Schools teachers considered this misconduct and gave him detentions.

122.    On October 3, 2016, Jacob was bullied on the bus ride home. Students tied Jacob's shoelaces to a seat-pole while he was asleep. Jacob frequently fell asleep on the bus home because of the medication he took to improve his behavioral and cognitive functioning.

123.    Jacob became fearful that the bus was not a safe environment and expressed concerns about continuing to ride the bus to school.

124.    Mrs. Elsharkawy immediately contacted Chisago Lakes Schools and expressed concerns regarding the bullying incident on the bus.  Nonetheless, Chisago Lakes Schools allowed the bullying to persist.

125.    Rather, contrary to the accommodations provided by his IEP, Chisago Lakes Schools staff threatened to discipline Jacob if he fell asleep on the school bus again.

31

126.    On October 25, 2016, Jacob was violently assaulted by two students.  He was thrown against a metal door frame, causing him to fall and lose consciousness.  Following this incident, Jacob was diagnosed as having suffered a concussion from a head injury and a shoulder injury.  The diagnosis instructed Jacob to limit his auditory and visual stimuli over the next 48-72 hours as these were determined to reproduce his symptoms.  He was also instructed to restrict participation in physical education for three days due to his shoulder injury.

127.    Both Mrs. Elsharkawy and Jacob reported the incident the day after it occurred to Assistant Principal Gillach, who was a member of Jacob's IEP team at the time.  Mrs. Elsharkawy provided the medical diagnosis to Gillach as confirmation of the incident.

128.    However, Chisago Lakes Schools failed to address the issue and allowed the students to persist in bullying Jacob.

129.    In a response to a complaint Mrs. Elsharkawy filed with the Minnesota Department of Education subsequent to Jacob's death, Chisago Lakes Schools claimed to have opened an investigation into this incident and determined "this was a situation in which friends were fooling around and one friend was too aggressive."  Chisago Lakes Schools also disputed the medical report because "it [did] not indicate how Jacob suffered the concussion or injured his shoulder."

130.    On February 12, 2017, Jacob was disciplined in violation of his IEP for being the victim of a bullying incident, which the disciplinary notice characterized as a major disruption:  "Jacob was lifted by other students in the hallways returning from lunch, presenting a danger to one-self others… This physical aggressiveness with friends is an on-

32

going issue." This disciplinary notice added that Jacob would be escorted for two weeks by Gillach after lunch back to his locker.

131.    On March 8, 2017, a student on Jacob's bus mocked him for wearing glasses, grabbed them and threw them towards a group of students, breaking them.

132.    Jacob had to attend school without his glasses for a week before they could be replaced.

133.    Both Mrs. Elsharkawy and the bus driver reported this incident to Chisago Lakes Schools staff.

134.    Gillach conducted an investigation and concluded that this incident was "two acquaintances engaging in playful conduct on the bus," and concluded this conduct did not rise to the level of bullying.

135.    As a result, Defendants once again did nothing to protect Jacob or discipline the student involved in bullying him.

136.    On May 15, 2017 another student mocked and bullied Jacob during lunch about his faith and religious dietary preferences, before picking up Jacob's sandwich and slamming it on a table.  Jacob was left with nothing to eat that day.

137.    This same student had a history of calling Jacob "terrorist" and "bomber man," and ridiculing Jacob's faith telling him that he would marry four wives.

138.    Mrs. Elsharkawy again reported this incident to Chisago Lakes Schools staff. Gillach conducted an investigation into the incident and determined that the student simply wanted to know what "Kosher" meant, and that no evidence existed that Jacob's sandwich was slammed on the table.   Gillach concluded that this incident did not rise to the level of bullying.

139.    As a result, once again, Defendants did nothing to protect Jacob or discipline the student involved in bullying him.

140.    On May 19, 2017, Mrs. Elsharkawy brought her concerns regarding bullying and the school's bullying prevention plan to the members of Jacob's IEP team at the time, which consisted of members from both Chisago Lakes Middle School and Chisago Lakes High School: Susan Shimota (PACER Representative), Brianna Claeson, Jim Gillach, Kyra Heidelberger, Jen DuFresne, Matthew Beaver, Kori Severson, Andrea McKinnon, Holly Erickson, Angela Christenson, Sheena Malm, and Hanna Rodenbaugh.  Mrs. Elsharkawy and Jacob were also members of the IEP team and attended each of the IEP meetings.

141.    During that meeting, Mrs. Elsharkawy raised serious concerns about bullying, namely that other students had been stealing things out of Jacob's backpack, calling Jacob derogatory names, and tampering with his lunch, and that staff were making derogatory comments regarding his behavioral and physical disabilities.

142.    Defendants simply responded by reminding her that they have a bullying policy and dismissed Mrs. Elsharkawy's concerns.

143.    Additional IEP team meetings were held on June 6, 2017 and August 31, 2017 to discuss, among other things, Jacob's IEP goals and objectives and Mrs. Elsharkawy's concerns regarding bullying and Defendants' failure to address her concerns and take precautions to modify Jacob's IEP or protect him.  However, Mrs. Elsharkawy's concerns were never addressed.

144.    Despite his IEP outlining that alternative tools should be used to address behavioral issues to achieve desired behaviors as opposed to taking disciplinary action, Jacob was disciplined at minimum on December 15, 2017 by his case manager at the time,

Defendant Mattson, and four times by IEP Team Member Defendant Thompson from January 2018 until the time of Jacob's death. He was also disciplined several times by other Chisago Lakes Schools staff. In fact, between January 2018 and the time of Jacob's death in April 2018, Jacob was disciplined regularly in violation of his IEP.

145.    As early as January 12, 2018, a special IEP meeting was held to discuss Mrs. Elsharkawy's serious concerns regarding inappropriate disciplinary action against Jacob in violation of his IEP.

146.    By that point, Jacob had already been disciplined no less than four times since school resumed after Christmas Break, including twice by Defendant Thompson. Defendant Thompson, who was also the Chisago Lakes High School Truancy Coordinator, had disciplined Jacob for missing school days in connection with his medical treatments despite having been provided the appropriate documentation from the doctors that were treating him in violation of his IEP.

147.    During the January 12, 2018 meeting, Defendant Hoffman dismissed Mrs. Elsharkawy's concerns that Jacob was being disciplined for absences due to required medical treatment for bullying incidents by saying "it's like, what comes first, the chicken or the egg."

148.    Despite Mrs. Elsharkawy's concerns, Defendant Thompson continued to discipline Jacob for absences from school, despite several of those days being a result of doctor's appointments and emergency medical care to seek treatment for severe medical injuries Jacob had suffered due to violent bullying incidents while under the school's protection that Defendant Thompson was aware of.

149.    Jacob also continued to be disciplined for being tardy to class by Defendant Thompson and others. However, in addition to the disciplinary actions themselves being a

clear violation of his IEP, Chisago Lakes High School did not provide him with a paraprofessional escort to escort him between classes in accordance with IEP evaluations, which would have resolved the issue of Jacob being tardy to class.

150.    Due to Mrs. Elsharkawy's repeated concerns, Defendants continued to discipline Jacob but stopped issuing disciplinary notices in writing that would have informed her of the continued disciplinary actions being taken against Jacob in violation of his IEP.

151.    Mrs. Elsharkawy continued to voice her concerns regarding inappropriate disciplinary procedures being taken against Jacob in violation of his IEP, which prompted another special IEP meeting that was held on February 12, 2018 to address her concerns.

152.    However, the district improperly concluded as a result of that meeting contrary to the clear accommodations in his IEP that "[w]hile in the behavior room students sign a contract … The IEP is still followed in the behavior room," and Jacob [k]new [sic] best what would calm or redirect him … No other concerns were identified by the Team."

153.    The district reached this conclusion despite also finding concurrently that "[w]hen warned or redirected Jacob stated that he may not even know he is getting a warning until it is to[o] [sic] late."

154.    Defendants continued to discipline Jacob on a regular basis in violation of his IEP, despite Mrs. Elsharkawy's repeated pleas to adhere to his IEP, and despite visible signs that his mental health condition was worsening at a significant and dangerous pace, including visible increases of anxiety, stress, depression, anger and rage.

155.    In March 2018, Jacob made his first-ever art project—a character that he liked from a video game out of clay.  His art teacher mocked him in class in front of the rest of the students.

156.    Also, in March, his special education teacher gave him a 1-day in-school suspension for fidgeting in his seat—a behavioral issue that was also accommodated for in his IEP. While serving his detention in the behavior room, he was prevented from using the bathroom and his electronics to inform his mother about his suspension—both violations of his IEP.

157.    Jacob suffered from a severe anxiety attack while serving his in-school suspension. Nonetheless, his special education teacher made him sign a contract that the next time he fidgeted in his seat he would receive a 2-day suspension.

158.    Mrs. Elsharkawy expressed her concerns to Defendant Mattson that his special education teacher should have determined the reason Jacob was fidgeting in class. In response, Defendant Mattson dismissed Mrs. Elsharkawy's concerns that the in-school suspension was a violation of Jacob's IEP and accused Mrs. Elsharkawy of questioning the teacher's authority.

159.    Within a couple days, Mrs. Elsharkawy wrote a letter about what happened and sent it to Defendant Mattson, in addition to other Chisago Lakes Schools staff.

160.    At the end of March, another special IEP meeting was held to discuss Mrs. Elsharkawy's concerns. Jacob explained that he wanted teachers to know that other students are constantly bullying him, that he suffers from anxiety attacks as a result, and that this is the cause for him being tardy to classes. Mrs. Elsharkawy reminded the IEP team that a paraprofessional is required to escort him between classes.

161.    The following day, Jacob was given another detention. Jacob begged his mother to stop complaining to the IEP team that he was being bullied, because every time she

did and every time he was the victim of a bullying incident, Defendants retaliated against him and gave him another detention.

162.    By this point, Jacob was getting detentions on almost a daily basis.

163.    His anxiety attacks were escalating severely because – in addition to his IEP being repeatedly violated – his sensory disorder was not being accommodated while he was serving his detentions and in-school suspensions in the behavior room. He described being in the behavior room to his mother as feeling like he was stabbing himself with a pencil.

164.    When Mrs. Elsharkawy raised her concerns yet again, Defendants told Mrs. Elsharkawy that he would be expelled from the school if he refused to serve his detentions and in-school suspensions.

165.    The week leading to Jacob's death by suicide, Jacob received a detention every day.  Jacob told his mother that if he "received one more detention," he was going to kill himself. Just three days before his death by suicide, he had another severe anxiety attack during detention.

166.    That Saturday, Jacob tragically hung himself.

167.    At no time in 2018 did Defendants perform an IEP Evaluation Report in accordance with his IEP.

## Claims for Relief

### COUNT I

**Violation of the Substantive Due Process Clause of the Fourteenth Amendment
to the United States Constitution, pursuant to 42 U.S.C. § 1983
(Failure to Protect)**

168.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

169.    Defendants acted under color of state law when they failed to protect Jacob in violation of the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

170.    Plaintiffs have a property right in public education, and as such, that right is entitled to protection under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

171.    Jacob had a right to bodily integrity, to due process, to be secure and left alone and to life, and as such, those rights entitled to protection under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

172.    Jacob was a vulnerable minor with physical and cognitive disabilities and deprived of normal opportunities of self-protection, vulnerabilities that the Defendants were well aware of and noted in connection with development goals in the various iterations of his IEP throughout his education with Defendants.

173.    Jacob's safety and his ability to develop the skills he needed for self-protection was entrusted to Defendants, who accepted that entrustment.

174.    Defendants had considerable power over Jacob's safety and his ability to develop the skills he needed for self-protection.

175.    In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and

provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

176.    Defendants' acts and conduct (including retaliatory disciplinary actions against Jacob, including detentions and in-school suspensions, when he or Mrs. Elsharkawy reported violence and bullying against Jacob) each time, caused Jacob to suffer a significant, visible and dangerous escalation in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, all of which are well-documented in their own records and Jacob's medical records in Defendants' possession, such that Jacob would inevitable take his own life.

177.    By retaliating against Jacob in violation of his IEP by giving him repeated detentions and in-school suspensions, Defendants entered into a special relationship with Jacob by restraining his individual freedom, thereby directly, willfully, maliciously and/or recklessly causing Jacob's medical condition to escalate to such a degree that it led to his suicidal death.

178.    Defendants' acts, conduct and omissions placed Jacob at substantial risk of serious, immediate, and proximate harm that was both known and obvious.

179.    Defendants' conscious disregard of the harm placed Jacob in shocks.

180.    As a direct and proximate result of the wrongful acts and omissions of Defendants, each of the Defendants have deprived Jacob of his life.

181.    Mrs. Elsharkawy is entitled to recover damages for the loss of (a) the value of the financial support Jacob would have contributed to her; (b) the loss of gifts or benefits that Mrs. Elsharkawy would have expected to receive from Jacob; (c) medical, funeral and burial expenses; (d) the reasonable value of the household services that Jacob would have provided; and (e) the loss of Jacob's love, companionship, comfort, care, consortium, instruction,

guidance, training, assistance, protection, affection, society and moral support and that of his next of kin.

182.    The above conduct of the Defendants was done maliciously, oppressively and with an intent to deprive Mrs. Elsharkawy of her right to a familial relationship with Jacob, such that an award of exemplary and punitive damages should be imposed against Defendants at an amount to be proven at trial.

WHEREFORE, Plaintiffs request this Honorable Court nominal, compensatory and punitive damages against all Defendants, in addition to all other costs and attorneys' fees, and all such other equitable relief this Honorable Court deems just and equitable.

## COUNT II

### Violation of Title V of the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq.
*(against municipal Defendants)*

183.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

184.    At all relevant times, the municipal Defendants operates an education program receiving federal financial assistance. Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Defendant Chisago Lakes School District may not exclude any person, on the basis of disability, from participating in any education program or activity receiving federal financial assistance, or deny benefits on the basis of disability, or subject that person to disability discrimination.

185.    The harassment/bullying directed at Jacob was due to his disability, specifically ADHD, anxiety disorder, asthma, fructose malabsorption, irritable bowel disease, migraines, postural orthostatic tachycardia, adjustment disorder, and sensory processing disorder , which was actually worsened by Jacob's fellow students and the municipal

41

Defendants' actions and omissions described above, as the treatment Jacob was expected to endure was so severe, pervasive, and persistent, that it effectively barred Jacob's access to educational  program, and/or created a hostile or abusive educational environment.

186.    The municipal Defendants failed to provide and/or implement reasonable accommodations to Jacob that he was entitled to under his IEP to accommodate his known physical and mental limitations, failed to allow him to benefit from the services, programs and activities offered by Defendants to other students including students with disabilities, singled him out for discrimination on the basis of his disabilities, disciplined him in violation of his IEP, disciplined him for school absences that were a result of seeking medical treatment in connection with injuries sustained due to physical violence by students, and retaliated against him on the basis of his disability, in violation of Section 504 of the Rehabilitation Act of 1973.

187.    Multiple students repeatedly acted with the intent to make Jacob feel intimidated, threatened, fearful, or apprehensive for his safety, humiliated, degraded, ostracized or excluded, subservient to other people, less important, or unworthy on the basis of Jacob's disability.

188.    In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

189.    The harassment and bullying that Jacob endured was so severe, pervasive, and objectionably offensive that it undermined and distracted from Jacob's access to the educational experience he was entitled to receive, such that he was effectively denied equal access to Defendants' resources and opportunities.

190.    Defendants failed to appropriately train their staff to protect Jacob in the school environment and to provide Jacob with safe transportation to and from school, in violation of Section 504 of the Rehabilitation Act of 1973.

191.    Defendants failed to protect the rights of Jacob and Mrs. Elsharkawy, failed to provide a free and appropriate education ("FAPE") that is specially designed to meet Jacob's needs, failed to provide a least restrictive environment or group Jacob in a learning environment or classroom setting with peers where he can achieve the highest academic and social progress, failed to provide modifications to Jacob's learning environment to accommodate Jacob's needs, failed to provide safe transportation to and from school, and significantly impeded Mrs. Elsharkawy's opportunity to participate in the decision-making process or provide meaningful input regarding the provision of a FAPE to Jacob and all decisions affecting Jacob's education, in violation of Section 504 of the Rehabilitation Act of 1973.

192.    Defendants failed to consider, investigate or address repeated complaints and concerns by both Jacob and Mrs. Elsharkawy regarding the adequacy of Jacob's IEP plan in addressing Jacob's special education services, FAPE, least restrictive environment, safety and well-being, due to the severe bullying Jacob suffered at the hands of employees and students at Defendant Chisago Lakes Schools, the immediate and severe risk of future physical harm

to Jacob, and the serious and negative impact on Jacob's mental health condition, in violation of Section 504 of the Rehabilitation Act of 1973.

193.    Defendants failed to (1) revise Jacob's IEP plan to address the above complaints and concerns; (2) failed to conduct any necessary review or reevaluation of Jacob's IEP plan in connection with the above complaints and concerns or in 2018 whatsoever despite the apparent and escalating severity of the above complaints and concerns; and, (3) otherwise failed to perform legally required responsibilities in a timely manner, in violation of Section 504 of the Rehabilitation Act of 1973.

194.    Defendants failed provide general procedural safeguards to protect Mrs. Elsharkawy's informed involvement or provide her with an opportunity to examine all relevant records related to any investigations purportedly conducted by Defendants in connection with the above complaints or concerns, in violation of Section 504 of the Rehabilitation Act of 1973.

195.    Defendants failed to provide Mrs. Elsharkawy and Jacob a meaningful opportunity to present their complaints and further failed to reach or implement a resolution, in violation of Section 504 of the Rehabilitation Act of 1973.

196.    Defendants refused to engage in an administrative review process or conduct an impartial due process hearing before a hearing officer, thereby depriving Mrs. Elsharkawy and Jacob of their due process rights, in violation of Section 504 of the Rehabilitation Act of 1973.

197.    As a direct, proximate, foreseeable result of Defendants' actions and omissions, Jacob incurred necessary and reasonable medical expenses, suffered physical pain and mental anguish, experienced other economic hardships, and ultimately took his own life.

44

198.    Further, Jacob's family has forever lost the love, services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of Jacob, together with all damages that Jacob suffered before his death and would have been entitled to recover had he lived.

WHEREFORE, Plaintiffs request this Honorable Court grant relief against the municipal Defendants in the form provided in the Prayer for Relief below. Plaintiffs further request this Honorable Court grant costs and attorneys' fees, plus all other equitable relief this Honorable Court deems just and equitable.

## COUNT III

### Violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.
### *(against municipal Defendants)*

199.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

200.    The Americans with Disabilities Act protects Plaintiffs and provides a cause of action that mirrors the cause of action provided by the Rehabilitation Act. *Moore v. Chilton County Bd. of Educ.*, 936 F. Supp. 2d 1300, 1313 (M.D. Ala. 2013); *Hoekstra By and Through Hoekstra v. Indep. Sch. Dist. No. 283*, 103 F.3d 624, 626 (8th Cir. 1996).

201.    For the same reasons the municipal Defendants violated the Rehabilitation Act, the municipal Defendants also violated the Americans with Disabilities Act.

202.    For the same reasons Plaintiffs are entitled to monetary relief under the Rehabilitation Act, plaintiffs are entitled to monetary damages under the Americans with Disabilities Act.

WHEREFORE, Plaintiffs request this Honorable Court grant relief against the municipal Defendants in the form provided in the Prayer for Relief below. Plaintiffs further

request this Honorable Court grant costs and attorneys' fees, plus all other equitable relief this Honorable Court deems just and equitable.

## COUNT IV

### Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983

203.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

204.    Defendants acted under color of state law when they denied Jacob the equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

205.    Defendants were aware that Jacob was being subjected to a torrent of bullying on the basis of his faith and his disabilities, yet Defendants failed to implement or modify his IEP, conduct any investigations, discipline the students involved in bullying Jacob, take corrective actions or any steps whatsoever to protect Jacob.

206.    Moreover, Defendants retaliated against Jacob by disciplining him and restraining him in detentions and in-school suspensions, in clear violation of his IEP, whenever he or Mrs. Elsharkawy reported a bullying incident, and in several instances, for school absences due to Jacob having to seek medical attention in connection with his injuries suffered by students that physically injured him.

207.    Defendants treated Jacob differently from other students including students with disabilities without any rational basis; and as such, Defendants' actions, omissions, failures to act, and breaches of duties and standards of care that they owed Jacob were irrational and abusive and wholly unrelated to any legitimate state activity.

208.    Defendants also treated Jacob differently from other students including students with disabilities due to animus against Jacob because of his faith and his disabilities.

209.    In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

210.    The harassment and bullying that Jacob endured was so severe, pervasive, and objectionably offensive that it undermined and distracted from Jacob's access to the educational experience he was entitled to receive, such that he was effectively denied equal access to Defendants' resources and opportunities.

211.    Because Defendants' omissions, failures to act, and breaches of duties and standards of care that they owed Jacob were irrational and abusive and wholly unrelated to any legitimate state activity, Defendants' actual motivations are irrelevant.

WHEREFORE, Plaintiffs request this Honorable Court grant relief against the municipal Defendants in the form provided in the Prayer for Relief below. Plaintiffs further request this Honorable Court grant costs and attorneys' fees, plus all other equitable relief this Honorable Court deems just and equitable.

## COUNT V

**Violation of the Substantive Due Process Clause of the Fourteenth Amendment
to the United States Constitution, pursuant to 42 U.S.C. § 1983
(Right to a Familial Relationship)**

47

212.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

213.    Defendants acted under color of state law when they violated Plaintiffs' rights to a familial relationship protected by the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution.

214.    Jacob was a vulnerable minor with physical and cognitive disabilities and deprived of normal opportunities of self-protection, vulnerabilities that these Defendants were well aware of and noted in connection with development goals in the various iterations of his IEP throughout his education with Defendants.

215.    Jacob's safety and his ability to develop the skills he needed for self-protection was entrusted to Defendants, who accepted that entrustment.

216.    Defendants had considerable power over Jacob's safety and his ability to develop the skills he needed for self-protection.

217.    In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

218.    Defendants' acts and conduct (including retaliatory disciplinary actions against Jacob, including detentions and in-school suspensions, when he or Mrs. Elsharkawy reported violence and bullying against Jacob) each time, caused Jacob to suffer a significant, visible

and dangerous escalation in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, all of which are well-documented in their own records and Jacob's medical records in Defendants' possession, such that Jacob would inevitable take his own life.

219.   Each of the Defendants were deliberately indifferent to, or acted with reckless disregard of, Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution to a familial relationship and companionship with Jacob, resulting in the death of Jacob and termination of the familial relationship.

220.   In engaging in and performing the acts, conduct and omissions described throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

221.   As a direct and proximate result of the wrongful acts and omissions of Defendants, each of the Defendants have deprived Jacob of his life.

222.   Mrs. Elsharkawy is entitled to recover damages for the loss of (a) the value of the financial support Jacob would have contributed to her; (b) the loss of gifts or benefits that Mrs. Elsharkawy would have expected to receive from Jacob; (c) medical, funeral and burial expenses; (d) the reasonable value of the household services that Jacob would have provided; and (e) the loss of Jacob's love, companionship, comfort, care, consortium, instruction, guidance, training, assistance, protection, affection, society and moral support and that of his next of kin.

223.    The above conduct of the Defendants was done maliciously, oppressively and with an intent to deprive Mrs. Elsharkawy of her right to a familial relationship with Jacob, such that an award of exemplary and punitive damages should be imposed against Defendants at an amount to be proven at trial.

WHEREFORE, Plaintiffs request this Honorable Court grant relief against the Defendants in the form provided in the Prayer for Relief below. Plaintiffs further request this Honorable Court grant costs and attorneys' fees, plus all other equitable relief this Honorable Court deems just and equitable.

## COUNT VI

### Wrongful Death (Minn. Stat. § 573.02 and Minn. Common Law)

224.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

225.    Jacob was a vulnerable minor with physical and cognitive disabilities and deprived of normal opportunities of self-protection, vulnerabilities that the Defendants were well aware of and noted in connection with development goals in the various iterations of his IEP throughout his education with Defendants.

226.    Jacob's safety and his ability to develop the skills he needed for self-protection was entrusted to Defendants, who accepted that entrustment.

227.    Defendants had considerable power over Jacob's safety and his ability to develop the skills he needed for self-protection.

228.    Multiple students repeatedly acted with the intent to make Jacob feel intimidated, threatened, fearful, or apprehensive for his safety, humiliated, degraded, ostracized or excluded, subservient to other people, less important, or unworthy because of

Jacob's religion and/or disability while Jacob was under Defendants' care, custody and control, within the meaning of "bullying" as defined by the Safe and Supportive School Act, Minn. Stat. Ann. §§ 121A.031(e) and (g).

229.   In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

230.   Defendants are liable for their breach of duties and standards of care they owed Jacob in violation of Minn. Stat. § 604.01.

231.   The municipal defendants breached their duties and standards of care they owed Jacob by failing to perform one or more mandatory duties in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.11, including, but not limited to:

232.   Failing to make reasonable modifications to policies, practices and/or procedures that were necessary afford the services, facilities, advantages, and accommodations tailored to Jacob's disability needs, in violation of Minn. Stat. § 363A.11, Subd. 3(2).

233.   Failing to take all necessary steps to ensure Jacob is not treated differently than other students because of his disability and related special services, in violation of Minn. Stat. § 363A.11, Subd. 3(3).

234.     Defendants Chisago Lakes School Board and Chisago Lakes Schools are vicariously liable for the negligent conduct of Defendants sued in their individual capacities that resulted in Jacob's death by suicide.

235.     Defendants Chisago Lakes School Board and Chisago Lakes Schools are also liable for the negligent supervision of Defendants sued in their individual capacities that resulted in Jacob's death by suicide.

236.     Defendants owed a duty to Jacob to comply with inter alia, the self-protection and care plan defined in Jacob's IEP and their own training, policies and procedures that related to Jacob's IEP and their policies pertaining to violence, harassment, discrimination and bullying in the school environment.

237.     Defendants failed to follow the clear direction of the IEP, training and Defendants' policies and procedures, all of which are described above at the expense of Jacob's safety, health, and mental and emotional well-being.

238.     Defendants failures Defendants to follow the clear direction of the IEP, training and Defendants' policies and procedures constituted—at the very least—negligence.

239.     The evaluation of whether Defendants used reasonable care is not a question of complex scientific or technological issues, rather is within the general knowledge and experience of lay persons.

240.     Defendants Chisago Lakes School Board and Chisago Lakes Schools breached their duties and standards of care they owed Jacob by failing to take reasonable steps to protect Jacob, that include, but are not limited to:

241.     Integrating into its existing curriculum an adequate program for violence prevention that includes, but is not limited to: (1) a comprehensive, accurate and age

52

appropriate curriculum on violence prevention, nonviolent conflict resolution, discriminatory harassment, and self-protection that promotes equality, respect, understanding, effective communication, individual responsibility, thoughtful decision-making, positive conflict resolution, useful coping skills, critical thinking, listening and watching skills, and personal safety; (2) planning materials, guidelines, and other accurate information on preventing physical and emotional violence, and identifying and reducing the incidence of discriminatory harassment; (3) involvement of and collaboration with parents and other community members, civic leaders and local community services, agencies and organizations in violence and bullying prevention; (4) adequate and ongoing training for its staff in helping students identify violence so that students may learn to resolve conflicts in effective, nonviolent ways; and, (5) adequate and ongoing training for its staff that involve experts familiar with personal safety, as defined by Minn. Stat. § 120B.22.

242.    Integrating into its existing curriculum an adequate program for bullying prevention that includes, but is not limited to:  (1) developmentally appropriate programmatic instruction to help students identify, prevent, and reduce prohibited conduct; value diversity in school and society; develop and improve students' knowledge and skills for solving problems, managing conflict, engaging in civil discourse, and recognizing, responding to, and reporting prohibited conduct; and make effective prevention and intervention programs available to students; (2) establish appropriate strategies for creating a positive school climate and use evidence-based social-emotional learning to prevent and reduce discrimination and other improper conduct; (3) engage all students in creating a safe and supportive school environment; (4) partner with parents and other community members to develop and implement appropriate prevention and intervention programs; (5) engage all students and

adults in integrating education, intervention, and other remedial responses into the school environment; (6) train student bystanders to intervene in and report incidents of prohibited conduct to the school's primary contact person; and, (7) teach students to advocate for themselves and others, as defined by the Minnesota Safe and Supportive Schools Act, Minn. Stat. § 121A.031, Subd. 5.

243.    Defendants Chisago Lakes School Board and Chisago Lakes Schools breached their duties and standards of care they owed Jacob by failing to perform one or more mandatory duties pursuant to the Minnesota Safe and Supportive Schools Act, Minn. Stat. § 121A.031, including, but not limited to:

244.    Adopting, implementing and/or reviewing and revising on a cycle consistent with other district policies and in consultation with students, parents and community organizations, a written policy that would have prevented the student bullying against Jacob in violation of Minn. Stat. § 121A.031, Subd. 3(a).

245.    Establishing    and/or    implementing    research-based,    developmentally appropriate best practices that include preventative and remedial measures and effective discipline for deterring policy violations and failing to foster active student, parent and community participation that would have prevented the student bullying against Jacob in violation of Minn. Stat. § 121A.031, Subd. 3(b).

246.    Failing to provide adequate and ongoing training for all school personnel to prevent, identify and respond to the student bullying against Jacob committed contrary to these Defendants' school bullying policy in violation of Minn. Stat. § 121A.031, Subd. 3(c).

247.    Failing to ensure to require and/or enforce school employees who witnessed school bullying, violence and harassment of Jacob or possessed reliable information that

would lead a reasonable person to suspect that Jacob is a target of bullying, violence and harassment to make reasonable efforts to address and resolve the bullying, thereby preventing the continued bullying of Jacob, violence and harassment in violation of Minn. Stat. § 121A.031, Subd. 4(a)(2).

248.   Failing to investigate reports of bullying against Jacob within three school days of the reports in violation of Minn. Stat. § 121A.031, Subd. 4(a)(3).

249.   Failing to immediately intervene to protect Jacob from student bullying, to provide remedial measures to the bullying and to ensure that remedial responses are tailored to the particular incidents of bullying against Jacob, Jacob's disabilities, and the nature of the bullying incidents in violation of Minn. Stat. § 121A.031, Subd. 4(a)(4).

250.   Retaliating against and failing to prohibit the retaliation against Jacob for asserting, alleging or reporting bullying, and failing to discipline school employees that did retaliate against Jacob for asserting, alleging or reporting bullying in violation of Minn. Stat. § 121A.031, Subd. 4(a)(5).

251.   Failing to revise Jacob's IEP to address the skills Jacob needed to respond to the bullying that would have provided him with the skills necessary to protect himself against continued bullying, in violation of Minn. Stat. § 121A.031, Subd. 4(a)(8).

252.   Failing to require ongoing professional development consistent with Minn. Stat. § 122A.60, to build the skills of all school personnel who regularly interacted Jacob, including but not limited to educators, administrators, school counselors, social workers, psychologists, other school mental health professionals, school nurses, cafeteria workers, custodians, bus drivers, athletic coaches, extracurricular activities advisors, and

paraprofessionals to identify, prevent, and appropriately address the bullying against Jacob, in violation of Minn. Stat. § 121A.031, Subd. 4(a)(10).

253.     Failing to inform Jacob and Mrs. Elsharkawy of their rights under state and federal data practices laws to obtain access to data related to the bullying incidents against Jacob and their right to contest the accuracy or completeness of the data in violation of Minn. Stat. § 121A.031, Subd. 4(a)(12).

254.     Defendants Chisago Lakes School Board and Chisago Lakes Schools breached their duties and standards of care they owed Jacob by failing to perform one or more mandatory duties pursuant to the Minnesota Human Rights Act, Minn. Stat. § 363A.11, including, but not limited to:

255.     Failing to make reasonable modifications to policies, practices and/or procedures that were necessary afford the services, facilities, advantages, and accommodations tailored to Jacob's disability needs, in violation of Minn. Stat. § 363A.11, Subd. 3(2).

256.     Failure to take all necessary steps to ensure Jacob is treated differently than other students because of his disability and related special services, in violation of Minn. Stat. § 363A.11, Subd. 3(3).

257.     Defendants Chisago Lakes School Board and Chisago Lakes Schools breached their duties and standards of care they owed Jacob failing to comply with mandatory reporting requirements as defined by Minn. Stat. § 626.556 regarding the ongoing and serious physical abuse Jacob was subjected to in the school environment, failing to conduct an investigation, and failing to take intervention and prevention efforts to address the immediate, serious and ongoing concerns for Jacob's safety.

258.   Defendants' repeated acts, conduct, omissions—including unjustified retaliatory disciplinary actions against Jacob when he or Mrs. Elsharkawy reported violence and bullying against Jacob—were the direct cause of Jacob's death by suicide.

259.   Jacob's death by suicide was reasonably foreseeable because:

260.   Defendants knew or should have known that their acts and conduct (including retaliatory disciplinary actions against Jacob, including detentions and in-school suspensions, when he or Mrs. Elsharkawy reported violence and bullying against Jacob) caused Jacob to suffer a significant, visible and dangerous escalation in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, all of which are well-documented in their own records and Jacob's medical records in Defendants' possession, such that Jacob would inevitable take his own life.

261.   Defendants knew or should have known that their omissions (including their failures to investigate, take measures to protect Jacob in the school environment, and modify his IEP to provide Jacob with the skills he needed to protect himself against violence, harassment, discrimination and bullying) created a dangerous environment of violence, harassment, discrimination and bullying that caused Jacob to suffer severe physical injuries, including multiple concussions and broken bones, and that the violence, harassment, discrimination and bullying caused Jacob to suffer a significant, visible and dangerous escalation in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, all of which are well-documented in their own records and Jacob's medical records in Defendants' possession, such that Jacob would inevitable take his own life.

262.   Defendants knew or should have known that their acts, conduct and/or omissions would have more severe adverse impact on Jacob's mental and emotional health

because of his known disabilities and medical history than the average child that does not have Jacob's disabilities or medical history, such that Jacob would inevitable take his own life.

263. Defendants knew or should have known that their acts, conduct and/or omissions were causing Jacob to suffer a significant, visible and dangerous increase in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, such that Jacob would inevitable take his own life, because Mrs. Elsharkawy repeatedly complained about her fears and demanded that Defendants halt and/or modify their actions, conduct and/or omissions which she knew and understood to be the direct cause, and repeatedly demanded Defendants to revise Jacob's IEP to address these concerns.

264. Defendants knew or should have known that Jacob's significant, visible and dangerous increase in anxiety, rage, anger, panic attacks, depression, mental and emotional distress would continue to escalate, such that Jacob would inevitable take his own life, when they chose to willfully and maliciously ignore Mrs. Elsharkawy's repeated complaints and demands that Defendants halt and/or modify their actions, conduct and/or omissions, and repeated demands Defendants to revise Jacob's IEP.

265. Defendants knew or should have known that breaching their duties and standards of care that they owed Jacob were causing Jacob to suffer a significant, visible and dangerous increase in anxiety, rage, anger, panic attacks, depression, mental and emotional distress, such that Jacob would inevitable take his own life.

266. The apparent and visible escalation of Jacob's anxiety, rage, anger, panic attacks, depression, mental and emotional distress—combined with his preexisting disabilities—is reasonably foreseeable to cause Jacob to suffer an uncontrollable impulse, a

delirium, frenzy and/or rage during which he would take his life.  See *Logarta v. Gustafson*, 998 F. Supp. 998 (1998); (quoting *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 808 (1996) (quoting *Bogust v. Iverson*, 102 N.W. 2d 228, 232 (1960); (quoting *Daniels v. New York N.H. & H.R. Co.*, 183 Mass. 393, 67 N.E. 424 (1903)); (quoting *McLaughlin v. Sullivan*, 461 A.2d 123, 124 (1983); *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790-791 (1978); *Moss by Moss v. Meyer*, 454 N.E.2d 48, 50–51 (1983)).

267.   As a direct and proximate result of the Defendants' negligence, each of the Defendants have deprived Jacob of his life.

268.   Mrs. Elsharkawy is entitled to recover damages for the loss of: (a) the value of the financial support Jacob would have contributed to her; (b) the loss of gifts or benefits that Mrs. Elsharkawy would have expected to receive from Jacob; (c) medical, funeral and burial expenses; (d) the reasonable value of the household services that Jacob would have provided; and (e) the loss of Jacob's love, companionship, comfort, care, consortium, instruction, guidance, training, assistance, protection, affection, society and moral support and that of his next of kin.

269.   The above conduct of the Defendants was done negligently and with reckless disregard and indifference to Mrs. Elsharkawy's rights to a familial relationship with Jacob, such that an award of exemplary and punitive damages should be imposed against Defendants at an amount to be proven at trial.

270.   Each of the Defendants were deliberately indifferent to, or acted with reckless disregard of, Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution to a familial relationship and companionship with Jacob, resulting in the death of Jacob and termination of the familial relationship.

271.    As a direct and proximate result of the wrongful acts and omissions of Defendants, each of the Defendants have deprived Jacob of his life.

272.    The above conduct of the Defendants was done maliciously, oppressively and with an intent to deprive Mrs. Elsharkawy of her right to a familial relationship with Jacob, such that an award of exemplary and punitive damages should be imposed against Defendants at an amount to be proven at trial.

273.    Defendants' willful, wanton and malicious conduct, omissions, failures to act and breaches of their duties and standards of care that they owed both her and Jacob negligently and/or intentionally caused Mrs. Elsharkawy to suffer severe emotional distress of the worst kind – culminating with finding her child hanging moments after his suicidal death such that she is entitled to punitive damages.

274.    Defendants' conduct is so atrocious that it passes the boundaries of decency and is utterly intolerable in a civilized community.

275.    Defendants are not entitled to official immunity because of their failure to follow their ministerial duties and because their acts, omissions and breaches of duties and standards of care that they owed Jacob were willful and malicious.

276.    Defendants are not entitled to statutory immunity because their acts, omissions and breaches of duties and standards of care were not planning-level functions.

WHEREFORE, Plaintiffs request this Honorable Court grant relief in the form provided in the Prayer for Relief below.  Plaintiffs further request this Honorable Court grant nominal, compensatory and punitive damages against all Defendants, in addition to all other costs and attorneys' fees, and all such other equitable relief this Honorable Court deems just and equitable.

## COUNT VII

### Intentional Infliction of Emotional Distress
### *(by Mrs. Elsharkawy)*

277.    Plaintiffs reallege the allegations throughout this Complaint as if fully set forth herein.

278.    Defendants' actions, omissions, failures to act and breaches of their duties and standards of care that they owed Jacob and Mrs. Elsharkawy, described above, are extreme, outrageous, intentional, and reckless.

279.    In engaging in and performing the acts, conduct and omissions described throughout this Complaint, and in failing to comply with state and federal laws as outlined throughout this Complaint, Defendants breached their duties and standards of care that they owed to Jacob that required them to implement and/or modify Jacob's IEP, implement disciplinary action against those who bullied him, and take all reasonable steps to protect and provide a safe environment for Jacob, thereby creating a school environment and culture that is tolerant and ripe for the torrent of bullying Jacob endured.

280.    Defendants intended to either cause Jacob and Mrs. Elsharkawy  to suffer extreme emotional distress or acted with the knowledge that their actions, omissions, failures to act and breaches of their duties and standards of care that they owed them were substantially certain, or at the very least, highly probable, to cause severe emotional distress for Jacob and Mrs. Elsharkawy.

281.    The emotional and mental distress that Jacob suffered was so severe that: (1) no reasonable child could be expected to endure it; (2) no child that is vulnerable and suffers from the same disabilities as Jacob could be expected to endure it; and, (3) it led to his suicidal death.

282.   Defendants' conduct, omissions, failures to act, and breaches of their duties and standards of care that they owed both Mrs. Elsharkawy and Jacob caused Mrs. Elsharkawy to suffer severe emotional distress of the worst kind—culminating with finding her child hanging behind her home moments after his suicidal death.

283.   Defendants' conduct is so atrocious that it passes the boundaries of decency and is utterly intolerable in a civilized community.

284.   Defendants' actions, omissions, failures to act, and breaches of their duties and standards of care that they owed Jacob were the proximate cause of Jacob's severe emotional distress and suicidal death.

285.   Mrs. Elsharkawy is entitled to recover damages for the loss of: (a) the value of the financial support Jacob would have contributed to her; (b) the loss of gifts or benefits that Mrs. Elsharkawy would have expected to receive from Jacob; (c) medical, funeral and burial expenses; (d) the reasonable value of the household services that Jacob would have provided; and, (e) the loss of Jacob's love, companionship, comfort, care, assistance, protection, affection, society and moral support and that of his next of kin.

WHEREFORE, Mrs. Elsharkawy requests this Honorable Court grant nominal, compensatory and punitive damages against all Defendants, in addition to all other costs and attorneys' fees, and all such other equitable relief this Honorable Court deems just and equitable.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand a trial by jury of the above-referenced causes of action.

Respectfully submitted,

CAIR-Minnesota

By: s/ Alec Shaw
Alec Shaw (MN # 0401082)
    ashaw@cair.com

2511 East Franklin Avenue, Suite 100
Minneapolis, MN 55406
Telephone: (612) 206-3360

CAIR NATIONAL LEGAL DEFENSE FUND

By: s/ Lena Masri
Lena Masri (VA # 93291) α
    lmasri@cair.com
Gadeir Abbas (VA # 81161) α β
    gabbas@cair.com
Justin Sadowsky (VA # 73382) α
    jsadowsky@cair.com
Ankur Sakara (DC #1612755) α

453 New Jersey Ave SE
Washington, DC 20003
Telephone: (202) 742-6420

*Attorneys for Plaintiffs*

α *Pro Hac Vice admission forthcoming*
β *Licensed in VA, not in DC. Practice limited to federal matters.*

September 16, 2020